# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-20494

United States Court of Appeals
Fifth Circuit

**FILED**

November 28, 2018

Lyle W. Cayce
Clerk

E. R., by next of friend E. R.; S. R.; K. R.,

     Plaintiffs - Appellants

v.

SPRING BRANCH INDEPENDENT SCHOOL DISTRICT,

     Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-58

Before JONES, BARKSDALE, and WILLETT, Circuit Judges.

PER CURIAM:

This appeal under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1482 (IDEA), following E.R.'s receiving adverse decisions at both the state-administrative and district-court levels, generally contests whether the court erred in:  denying E.R.'s request to present additional evidence; applying *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017); and granting summary judgment to Spring Branch Independent School District (SBISD).  AFFIRMED.

## I.

E.R. is a child with substantial health impairments, which entitle her to special education and services from SBISD, her school district.  Concerning

those impairments, E.R. has a history of life-threatening, yet non-convulsive, seizures, manifested, *inter alia*, by minor changes in her personality.  The seizures must be timely treated by activating an implanted vagus-nerve stimulator and administering a Diastat suppository within two minutes. Additionally, E.R. has permanently implanted shunts in her head that could fail, attention-deficit hyperactivity disorder (ADHD), a speech impairment, and impaired concentration.  E.R. is globally developmentally delayed with an IQ of 51, and her medicines affect her ability to progress academically. Nevertheless, she can learn and enjoys doing so.

E.R. began the first grade in SBISD in 2011.  Although her home school was Frostwood Elementary (only a block away), she attended Wilchester Elementary because, at the time, Frostwood did not have a life-skills program. E.R.'s parents were pleased with Wilchester overall.

E.R.'s academic years are based on individualized education plans (IEP) developed at admission, review, and dismissal committee (ARDC) meetings. *See generally* 20 U.S.C. § 1414(d) (defining an IEP and its use); *id.* § 1414(d)(2)(A) (requiring an IEP be in place "[a]t the beginning of each school year"); *id.* § 1414(d)(4)(A)(i) (requiring the IEP to be reviewed at least annually).  ARDC meetings are to include, among other things, a discussion of the child's present levels of academic achievement and functional performance, and to set future goals.  *Id.* § 1414(d)(1)(A)(i) (describing IEP components). Parents attend ARDC meetings and sign-off on the decisions made. *See id.* § 1414(d)(1)(B) (including "parents of a child with a disability" being part of the "individualized education program team").

Concerning the issues at hand, E.R.'s parents attended the ARDC meeting in April 2014, which set the 2014-15 IEP goals for E.R.'s upcoming fourth-grade year.  The 2014-15 IEP enumerated seven goals across four subjects (language arts, math, science, and social studies); and transferred

E.R. from general-education to life-skills science, with fine arts being her only class in a general-education setting. At this meeting, E.R.'s parents were assured E.R. would continue attending Wilchester the next school year (2014-15); and they signed the proposed IEP.

About a week later, however, Mathis, SBISD's coordinator for developmental disabilities, informed E.R.'s father that, for the 2014-15 school year, E.R. might be transferred to Frostwood, which was opening a life-skills program, and, as noted *supra*, was E.R.'s home school. (Again, E.R. lived only a block away.) In response to this possibility, E.R.'s father emailed SBISD his concerns, which included whether the Frostwood staff had the ability to cope with E.R.'s medical condition. In the email, E.R.'s father withheld approval of the transfer, but also suggested SBISD personnel could be transferred to Frostwood with E.R.

SBISD transferred E.R. to her home school, Frostwood, for the 2014-15 school year; but, in doing so, it also transferred Firozgary (an aide already familiar with E.R.) with E.R. In an email to Mathis, E.R.'s father stated Firozgary's transfer "[brought] a lot of relief".

Frostwood held a luncheon to welcome its new families. E.R.'s parents were unable to attend, but did visit the school prior to the start of the 2014-15 school year. During this visit, E.R.'s father developed numerous concerns about the facility, the staff, and the morning drop-off procedures.

Frostwood's principal accommodated E.R.'s father's request for morning drop-off the same day she met with him; invited E.R.'s parents to meet with her in order for her to learn more about E.R.; and welcomed open communication regarding areas in which Frostwood could improve. Moreover, in response to concerns about the number of people trained to assist E.R. in an emergency, the school nurse trained the life-skills staff, three nearby teachers, and a speech teacher.

No. 17-20494

During September 2014, E.R.'s parents and Pye, E.R.'s teacher, corresponded by email regarding E.R. Pye would communicate with E.R.'s parents concerning E.R.'s progress on her goals, what she ate, the location of her medicine, her ability to focus, and her physical status. In an email to Pye, E.R.'s father thanked her for one of her updates and said he "deeply appreciate[d] everything [she was] doing for [E.R.] and the class". Additionally, Pye would email E.R.'s parents when E.R. had an off day. Once, after communicating with E.R.'s mother, Pye agreed to microwave E.R.'s food to make it more appealing to her.

Pye took other steps to ensure free-flowing communication with E.R.'s parents. For example, she emailed them a flyer she sent home with E.R., to ensure they received it. And, Pye set up a blog where she would post updates about the class and E.R. In an email to Pye, E.R.'s mother wrote "[t]he website looks great" and suggested more information Pye could include in the blog posts that could "help [E.R.'s parents] communicate with [E.R.]" about her day. In a mid-September email, E.R.'s father described the updates from Pye as "spectacular" and was "deeply appreciative", although, during his testimony to the state hearing officer, he described that email as simply to "motivat[e]" Pye.

Pye went so far as to give E.R.'s parents her cell-phone number, and testified, before the hearing officer, that she and "[E.R.'s mother] . . . would text each other frequently during the day". E.R.'s parents were also impressed with Firozgary, and on occasion would utilize her to transport E.R. home from school when they were too busy.

SBISD continued to fulfill E.R.'s father's requests. In a 9 October 2014 email to Pye and Frostwood's principal, E.R.'s father complained about the school's allowing Pineda, a paraprofessional who assisted Pye, to work with E.R.; threatened to keep E.R. at home if Firozgary was absent; and stated he had been "fully prepared to take appropriate action to stop the transfer from

4

No. 17-20494

Wilchester" had Firozgary not been transferred with E.R. In her email response to E.R.'s father, Pye assured him accommodations would be made when Firozgary could not attend to E.R.

Pye continued communicating with E.R.'s parents and involved them in decision-making. For example, when Pye and Pineda were going to be absent one day, Pye included E.R.'s parents, by email, on the decision for which art class E.R. should attend, explaining why there was a scheduling problem and giving E.R.'s parents two options from which to choose. In an email response, E.R.'s father thanked Pye for being kept in the loop and stated, *inter alia*: "Whereas you have an alternative in-class activity planned, let's not go crazy over one art class".

E.R. had a shunt failure in school in mid-October 2014, and, during the incident, complained of neck pain. Pye realized E.R.'s complaints of neck pain were abnormal, and contacted E.R.'s mother; E.R. was treated at a children's hospital, and returned to class the next week.

By late October, Pye received an unfavorable medical diagnosis. Seemingly in response to Pye's anticipated absences, E.R.'s father, on 21 October, emailed Teater, the coordinator for behavioral programming, that he was considering filing a lawsuit and would "act with unimpeded professional aggressiveness". (E.R.'s father is a lawyer.)

In response, Teater emailed E.R.'s father "to reassure [him]" Frostwood would have a certified special-education teacher in the life-skills class. Teater also visited E.R.'s classroom the next day. She communicated to E.R.'s father positive findings relating to E.R., and also arranged for a visit by an instructional facilitator.

In addition to the instructional facilitator, two experts, who specialized in training the teachers, reviewed the class. Their findings were also largely positive, noting E.R. was progressing.

5

No. 17-20494

Additionally, the school held a meeting for all the life-skills parents on 27 October to hear their concerns and address Pye's absences. E.R.'s father testified, before the hearing officer, that he stated a desire at the meeting for E.R. to return to Wilchester, but was "not dead set" on Wilchester if there was a better option. SBISD refused the transfer request. In that regard, E.R.'s father later testified, before the hearing officer, that he said he did not want to have E.R. "somewhere that is anything less than perfect". Frostwood's life-skills program continued.

In late November, E.R.'s father emailed Teater and the director of special education to request an ARDC meeting; it was held in early December. At the meeting, E.R.'s father voiced his concerns regarding communication issues; and, although he articulated a willingness to work with SBISD, he also expressed a desire to reopen discussions regarding where E.R. would attend school. The ARDC did not make any decisions, and SBISD's attorney advised the attendees he would follow up with E.R.'s father.

Pye resigned two days later. The principal employed a retired life-skills teacher to fill in temporarily.

Not having heard from SBISD following the December ARDC meeting, E.R.'s father sent it a letter on 5 January 2015, the day before classes began. He complained, *inter alia*, about the lack of communication, the conditions at Frostwood, and E.R.'s progress there; and he informed the school he would both pursue a private education for E.R. and commence "filing . . . a complaint and request for investigation with the Texas Education Agency".

E.R. attended only Frostwood's first week of classes in January 2015. Although E.R.'s father testified, before the hearing officer, that the substitute teacher during that week was "very experienced", E.R.'s father informed SBISD, by an 11 January email, that he was withdrawing E.R. from Frostwood. He cited the lack of a certified teacher who would be available the

next day for class.  E.R.'s parents signed a contract with Briarwood, a private school located 12 to 13 miles from E.R.'s home, which E.R. began attending on 12 January.

Contrary to E.R.'s father's testimony before the hearing officer, describing the transfer to Briarwood as an "emergency", it was neither sudden, nor unplanned.  E.R.'s parents had applied for E.R.'s admission to Briarwood in November 2014, stating on the application that a private school would be better for E.R.  E.R.'s father expressed his admiration for Briarwood in an email to a Briarwood employee that month.  E.R. and her parents had visited the school in early December, before the ARDC meeting, and E.R. had again visited Briarwood, before starting there, in early January 2015.

On 16 January, E.R.'s father provided SBISD with the ten-day notice (although belated), required by 20 U.S.C. § 1412(a)(10)(C)(iii) ("The cost of reimbursement . . . may be reduced or denied . . . if . . . 10 business days . . . prior to the removal of the child from the public school, the parents did not give written notice to the public agency".).  The notice stated:  E.R. would no longer attend Frostwood and opted for Briarwood; and SBISD had denied E.R. the IDEA-required free appropriate public education (FAPE).

In February 2015, E.R.'s parents made their first request for an IDEA due-process hearing, requesting, *inter alia*, tuition reimbursement for Briarwood following "[a] finding that [E.R.] ha[d] been denied a FAPE during the 2014-2015 school year and that Briarwood . . . [was] an appropriate placement". *See generally id.* § 1415 (describing the procedural safeguards afforded to children covered by IDEA).  A failed attempt at resolution took place later that month.

That July, after noting the lack of an IEP for the 2015-16 school year, E.R.'s attorney gave SBISD notice E.R. would stay at Briarwood for the 2015-16 school year, and stated SBISD was required to reimburse the cost of tuition

for Briarwood for that school year as well.  That same month, E.R.'s parents filed their second request for a due-process hearing.

In response to E.R.'s attorney's July notice, SBISD held an ARDC meeting in August to discuss a new IEP for E.R. for the 2015-16 school year; E.R.'s parents rejected the decisions made.  The minutes reflect:  by the end of the meeting, "[E.R.'s attorney] indicated that the parents [did] not feel that [E.R. was] receiving [a] FAPE"; the parents requested tuition reimbursement for private school; one of them "declined" to reconvene the ARDC; and their attorney gave a "written statement of disagreement".  E.R. continued attending Briarwood.

For three days in September 2015, a hearing officer heard evidence on E.R.'s two due-process complaints; by alleging numerous failures on the part of SBISD, both contend, at bottom, that SBISD denied E.R. a FAPE.  E.R. had the benefit of counsel.  The hearing officer heard the testimony of 15 witnesses and admitted nearly 1,700 exhibits. *E.R., ex rel. S.R. & K.R. v. Spring Branch Indep. Sch. Dist.*, No. 4:16-CV-0058, 2017 WL 3017282, *10 (S.D. Tex. 15 June 2017), *adopted by* 2017 WL 3016952 (S.D. Tex. 14 July 2017).  The hearing-officer's decision that October was in favor of SBISD on all issues, including that Briarwood was *not* an appropriate placement.  As a result, E.R. received no tuition reimbursement.

E.R. filed this action in January 2016, seeking, *inter alia*, reimbursement for the private-school tuition.  Both sides moved for summary judgment, and the district court referred the cross-motions to a magistrate judge.

In an exhaustive and insightful 74-page report and recommendation in June 2017, the magistrate judge carefully considered the evidence and the parties' contentions.  *See generally E.R.*, 2017 WL 3017282.  In doing so, the magistrate judge considered recent Supreme Court precedent, *Endrew F.,* in the well-reasoned report and recommendation.  *Id.* at *13, *29–30, *33–34. The

magistrate judge recommended the district court grant summary judgment to SBISD, concluding, *inter alia*, that E.R. received a FAPE and was not entitled to private-school-tuition reimbursement. *Id.* at \*35. For the reasons provided *infra*, the magistrate judge did not address whether Briarwood was an appropriate placement. *Id.* at \*35.

In a one-page order on 14 July 2017, the district court stated it had considered the applicable law, the report and recommendation, and E.R.'s objections, including reviewing *de novo* the recommendations to which those objections had been made; it adopted the report and recommendation in full. *E.R.*, 2017 WL 3016952, at \*1.

II.

E.R. claims the court erred in: not admitting additional evidence; applying Supreme Court precedent; granting summary judgment to SBISD against E.R.'s claimed procedural and substantive due-process violations of IDEA; and failing to rule Briarwood was an appropriate placement.

For this appeal, although a summary judgment is being reviewed, a district court's ruling on such motions in IDEA proceedings is not typical for summary-judgment proceedings, as reflected in *Seth B. ex rel. Donald B. v. Orleans Parish Sch. Bd.*, 810 F.3d 961, 966–67 (5th Cir. 2016). There, our court described a district court's summary-judgment procedure for an IDEA claim:

> Under 20 U.S.C. § 1415(i)(2)(C) . . . a district court must (i) "receive the records of the administrative proceedings"; (ii) "hear additional evidence at the request of a party"; and (iii) base "its decision on the preponderance of the evidence" and "grant such relief as the court determines is appropriate." The district court is required to "accord 'due weight' to the hearing officer's findings," but it "must ultimately reach an independent decision based on the preponderance of the evidence." Thus, "the district court's 'review' of a hearing officer's decision is 'virtually de novo.'"

> Accordingly, in IDEA proceedings, summary judgment "is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed."

*Id.* (footnotes omitted).

Accordingly, for appeals in IDEA actions, our standard of review for such summary judgments is obviously more expansive than the usual *de novo* review for summary judgments, as prescribed by Federal Rule of Civil Procedure 56(a). Our standard of review for IDEA appeals is described generally here and more specifically *infra*. For such an appeal, our court "review[s] *de novo*, as a mixed question of law and fact, a district court's decision that a local school district's IEP was or was not appropriate and that an alternative placement was or was not inappropriate under the IDEA". *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997) (footnote omitted). Toward that end, "[t]he district court's findings of underlying fact, such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error". *Id.* (footnote omitted). "[A] party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA". *Id.* (footnote omitted).

Several times throughout this appeal, E.R. points to her briefing in district court. Our court has resoundingly rejected such a tactic. *Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993) (rejecting the contention that a party can incorporate district court assertions by reference and ruling a party can "abandon[] these arguments by failing to argue them in the body of [the appellate] brief"); *Sigaran v. U.S. Bank Nat'l Ass'n*, 560 F. App'x 410, 415 (5th

No. 17-20494

Cir. 2014) (citing Fed. R. App. P. 28(a)(8)(A); *Yohey*, 985 F.2d at 224–25) (rejecting an attempt to "incorporate by reference" district-court briefing). Accordingly, E.R.'s contentions in her district-court, but not in her appellate, briefs are waived.

A.

In asserting the district court erred in denying E.R.'s motion to submit additional evidence, E.R. maintains: "additional evidence *must* be allowed when requested by a party" (emphasis added); and the district court's "*carte blanche* refusal to allow E.R. any opportunity to present additional evidence and have it considered and ruled upon by the district court in this matter constituted a clear violation of the express language of the IDEA and an abuse of discretion". Outside E.R.'s claim that the district court "must" admit additional evidence, our court "review[s] . . . evidentiary rulings under the abuse of discretion standard", *Jones v. Benefit Trust Life Ins. Co.*, 800 F.2d 1397, 1400 (5th Cir. 1986) (citing *Muzyka v. Remington Arms Co.*, 774 F.2d 1309, 1313 (5th Cir. 1985)); *see also G.J. v. Muscogee Cty. Sch. Dist.*, 668 F.3d 1258, 1268 (11th Cir. 2012) ("review[ing] a district court's decision to deny a motion for additional evidence for an abuse of discretion" in an IDEA action (citation omitted)); and "will reverse a judgment on the basis of evidentiary rulings only where the challenged ruling affects a substantial right of a party", *Jones*, 800 F.2d at 1400 (citations omitted); Fed. R. Evid. 103(a).

In conjunction with E.R.'s motion to submit additional evidence, the parties submitted briefs to the court on whether to admit it. Upon considering E.R.'s motion, the court denied it without stating reasons.

IDEA states district courts "shall hear additional evidence at the request of a party". 20 U.S.C. § 1415(i)(2)(C)(ii); *see also Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000) (district court is "required to take additional evidence at the request of any party" (citation omitted)). E.R.

11

maintains the above-quoted language from *Seth B.*—"a district court must . . . 'hear additional evidence at the request of a party'", *Seth B.*, 810 F.3d at 966 (citing 20 U.S.C. § 1415(i)(2)(C))—"infers that additional evidence should be allowed when requested".

But, as provided by IDEA, the evidence must be "additional". *Town of Burlington v. Dep't of Educ. for Mass.*, 736 F.2d 773, 790 (1st Cir. 1984). "The determination of what is 'additional' evidence must be left to the discretion of the trial court". *Id.* at 791.

"[T]his [additional-evidence] clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of 'additional'". *Id.* at 790; *see also Monticello Sch. Dist. No. 25 v. George L. ex rel. Brock L.*, 102 F.3d 895, 901 (7th Cir. 1996) ("A district court is not required to allow all evidence proffered by a plaintiff in an IDEA proceeding."). And, courts should "avoid turning the administrative hearing into a 'mere dress rehearsal' followed by an 'unrestricted trial *de novo*'". *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 476 (4th Cir. 2009) (citation omitted).

"[I]f parties could always introduce additional evidence in the district court 'to patch up holes in their administrative case,' administrative proceedings would no longer receive the weight that they are due". *Id.* (citation omitted). After all, "[r]endering a decision on the record compiled before the administrative agency . . . is the norm". *West Platte R-II Sch. Dist. v. Wilson*, 439 F.3d 782, 785 (8th Cir. 2006) (citing *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 560 (8th Cir. 1996)) (holding "district court did not abuse its discretion in denying the District's request to supplement the record" with evidence relating to the student's progress after the administrative hearing when there was a "vast and detailed administrative record").

After a three-day hearing before the hearing officer, E.R. failed to establish she was entitled to relief.  E.R. had the assistance of an attorney; the same attorney who represented her before the district, and our, court.  And, although E.R. disagrees with the outcome, E.R. does not contend she received anything less than a procedurally-adequate administrative hearing.  *See Monticello Sch. Dist.*, 102 F.3d at 902 (finding "district court . . . did not abuse its discretion in concluding that, because there had been no procedural infirmaries in the administrative proceedings, there was no reason to . . . allow additional evidence into the record as to, the substantive aspects of the Parents' IDEA claims").

On appeal, however, E.R. contends the district court erred by not considering even more evidence from two expert, and two fact, witnesses (in district court, E.R. stated she might have "possibly five factual witnesses").  And, as noted, even though E.R. briefed her motion in district court, E.R. claims the court engaged in a "*carte blanche* refusal to allow E.R. any opportunity to present additional evidence and have it considered and ruled upon".

Nor does E.R. explain why the limitations in the Federal Rules of Evidence do not apply.  Perhaps that is because E.R. claims the requested additional evidence must be admitted.  *See* Fed. R. Evid. 1101(a) ("These rules apply to proceedings before . . . United States district courts".); *see E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011) (noting evidence admitted under IDEA must still be "non-cumulative, relevant, and otherwise admissible").

In any event, we need not reach whether the court was required to allow the requested additional evidence, or otherwise abused its discretion in denying its submission, because E.R. fails to brief (including in her reply brief) how the claimed error affected a substantial right.  *See Jones*, 800 F.2d at 1400;

No. 17-20494

*Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 487 n.4 (5th Cir. 2017) (citing *Yohey*, 985 F.2d at 224–25) (noting when an issue is "insufficiently briefed" it is "abandoned"), *cert. denied* 138 S. Ct. 2000 (2018). Instead, E.R., in a footnote, simply lists by whom the briefly-described additional evidence would have been provided; again, E.R. made no attempt to show how the evidence would have made a difference in district court.

B.

E.R.'s contention that the court failed to apply correctly the recent Supreme Court decision in *Endrew F.* is reviewed *de novo*. *Seth B.*, 810 F.3d at 967 (citation omitted) (noting the *de novo* standard of review applies "'if the legal questions predominate'").

1.

Underlying this issue is the district court's (by adoption of the report and recommendation) applying our court's four-factor test from *Michael F.*, in deciding whether an IEP is appropriate:

> (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated.

*Michael F.*, 118 F.3d at 253. These factors "serve as indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA". *Id.* (footnote omitted).

In *Endrew F.*, the Court overturned tenth-circuit precedent's applying a "'merely more than *de minimis*'" standard for evaluating IEPs. *Endrew F.*, 137 S. Ct. at 1000–01. Ruling that "a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all", the Court held: "[IDEA]

requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances", *id.* at 1001; toward that end, the IEP must be "appropriately ambitious", *id.* at 1000; and, "[t]he 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials", *id.* at 999 (citation omitted).

Our court's four *Michael F.* factors and the Supreme Court's holding in *Endrew F.* do not conflict. *Endrew F.* rejected another circuit's precedent that provided a far lower threshold for an IEP than required by our court. *Id.* at 1000 ("standard [established in *Endrew F.*] is markedly more demanding than the 'merely more than *de minimis*' test applied by the Tenth Circuit"). *Endrew F.* provides more clarity for what constitutes an appropriate IEP, but it does not render the *Michael F.* factors inapplicable. Both fit together. Long before the Court decided *Endrew F.*, our court stated in *Michael F.* that "the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be 'likely to produce progress, not regression or trivial educational advancement'". *Michael F.*, 118 F.3d at 248 (footnotes omitted).

Our court recently addressed a similar issue in *C.G. ex rel. Keith G. v. Waller Indep. Sch. Dist.*, 697 F. App'x 816 (5th Cir. 2017). There, our court considered "whether the district court articulated a standard that is in line with the [*Endrew F.*] standard", using the *Michael F.* factors. *Id.* at 819. "Although the district court did not articulate the standard set forth in *Endrew F.* verbatim, its analysis of [the] IEP [at issue] is fully consistent with that standard and leaves no doubt that the court was convinced that [the] IEP was 'appropriately ambitious in light of [the child's] circumstances.'" *Id.* (footnote omitted). Here, the circumstances are even stronger than those in *C.G.* The adopted report and recommendation considered the *Endrew F.* decision several

No. 17-20494

times. *E.R.*, 2017 WL 3017282, at \*13, \*29–30, \*33–34. In short, *Endrew F.* was recognized and followed.

2.

As noted, pursuant to *Endrew F.*, "crafting an appropriate program of education requires a *prospective* judgment by school officials". *Endrew F.*, 137 S. Ct. at 999 (emphasis added) (citation omitted). E.R. contends the district court failed to perform that analysis. But, it specifically noted the *Endrew F.* standard and E.R.'s burden to show the two "IEPs were not reasonably calculated to enable her to make progress in [the] light of her circumstances". *E.R.*, 2017 WL 3017282, at \*30 (citing *Endrew F.*, 137 S. Ct. at 999). This was a prospective analysis; but, ultimately, E.R. failed to "produce[] any evidence to show that the goals were too easy, or that [she] was capable of doing more". *Id.* at \*31 (footnote omitted).

3.

E.R. also asserts the *Michael F.* standard cannot be applied to disabled children not taught in a mainstream classroom. This assertion, however, is based on E.R.'s now-rejected claim that *Michael F.* and *Endrew F.* cannot co-exist. The Court provided direction *via Endrew F.*; it did not overrule the *Michael F.* factors.

E.R. also intimates *Endrew F.* marked a departure from *Rowley*. *See generally Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176 (1982). In doing so, however, E.R. points to the following language from *Endrew F.*: "*Rowley* had no need to provide concrete guidance with respect to a child who is not fully integrated in the regular classroom and not able to achieve on grade level". 137 S. Ct. at 1000; *see generally Rowley*, 458 U.S. 176.

Read in context, the Court was merely noting how an IEP for a disabled child might not include grade-level advancement, while non-disabled children

generally do advance from grade to grade. *Endrew F.*, 137 S. Ct. at 1000. This makes sense because an IEP is necessarily individualized. In short, *Endrew F.* represents no major departure from *Rowley*. In *Endrew F.*, the Court specifically noted "Congress . . . has not materially changed the statutory definition of a FAPE since *Rowley* was decided". *Id.* at 1001 (citations omitted).

C.

For E.R.'s contention that the district court erred by granting SBISD summary judgment against the claimed SBISD procedural and substantive due-process violations that, according to E.R., denied her a FAPE, our court, as stated *supra*, "review[s] *de novo*, as a mixed question of law and fact, a district court's decision that a local school district's IEP was or was not appropriate"; and "[t]he district court's findings of underlying fact . . . are reviewed for clear error". *Michael F.*, 118 F.3d at 252 (footnotes omitted). "The clear error standard precludes reversal of a district court's findings unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (footnote omitted). And, "a party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA". *Michael F.*, 118 F.3d at 252 (footnote omitted).

For the procedural claims, "'procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity'". *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003) (footnote omitted). As discussed *supra*, for the substantive claims, our court evaluates whether there has been a violation of IDEA by using the four factors from *Michael F.* in conjunction with *Endrew F. See generally Endrew F.*, 137 S. Ct. 988; *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390 (5th Cir. 2012).

No. 17-20494

1.

In asserting her present level of academic achievement and functional performance (PLAAFP) in the 2014-15 IEP was deficient, E.R. claims it was predetermined by SBISD before it heard from E.R.'s parents and did not contain required information.  The PLAAFP is the starting point for the development of an IEP.  *Endrew F.*, 137 S. Ct. at 1000 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa)).

a.

Regarding E.R.'s contention that the PLAAFP was predetermined, the IEP development process should be collaborative and include "the input of the child's parents or guardians".  *Endrew F.*, 137 S. Ct. at 999 (citing *Rowley*, 458 U.S. at 208–09).  In that regard, the district court found E.R.'s parents were "active particip[ants]" in the IEP-development process.  *E.R.*, 2017 WL 3017282, at *25.

That finding was not clear error.  E.R.'s parents attended the 2014-15 IEP meeting and approved the decisions reached.  The record reflects "[t]he PLAAFP was reviewed and updated".  SBISD formulated the PLAAFP, then it was reviewed at the ARDC meeting.

b.

A PLAAFP includes "how the child's disability affects the child's involvement and progress in the general education curriculum".  20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa).  As noted, it is a part of an IEP.  *Id.* § 1414(d)(1)(A)(i) (describing the components of an IEP).  E.R. contends the PLAAFP did not address how her condition affected her learning and current performance levels.

E.R. contends the PLAAFP in the 2014-15 IEP was insufficient, despite her parents' signing it.  These complaints came only after E.R. was transferred

No. 17-20494

to Frostwood; the 2014-15 IEP was crafted while E.R. was at Wilchester, the school E.R.'s parents preferred.

The district court found that, "even if the preparation of the April 24, 2014[,] IEP was procedurally deficient in some respects, E.R. has not established that those procedural violations caused her to lose an educational opportunity or infringed her parents' opportunity to participate in the IEP process". *E.R.*, 2017 WL 3017282, at *23.

E.R. asserts Pye's using a trial-and-error technique at Frostwood to ascertain E.R.'s functionality is evidence the PLAAFP was inadequate. Pye's testimony before the hearing officer, however, shows she independently evaluated "any student coming in to a new life skills unit". She testified she did not feel the IEP made it difficult to establish E.R.'s functionality. Additionally, the district court reaffirmed the hearing officer's conclusion that Pye, who saw progress by E.R., was credible. *Id.* at *22. And, it was not just Pye who stated E.R. progressed at Frostwood. *Id.* at *21. SBISD arranged for several individuals to come in during the fall semester to evaluate Pye's class. *Id.* Even assuming the PLAAFP could have been better written, numerous educational professionals found E.R. was making appropriate progress. She was receiving an appropriately ambitious education and advancing towards the IEP's goals.

2.

E.R. asserts the 2014-15 PLAAFP and IEP were inadequate because they only addressed her "critical needs". E.R. claims this is an issue of first impression, and briefs it as both a procedural and substantive violation.

a.

Substantively, E.R. contends SBISD denied her a FAPE by limiting her IEP to critical needs and by not informing her parents of this limitation. Without citation, E.R. asserts "[t]his is a *per se* violation of the IDEA".

"The [Texas Essential Knowledge and Skills (TEKS)] for fourth grade students contain 23 strands and 194 standards". *Id.* at *25 (footnote omitted). "A strand is a component, or category, in each area of TEKS." *Id.* at *11 n.31. General-education curriculum addresses all strands. But, as Pye testified to the hearing officer, special needs students are "never expect[ed] . . . to function at grade level or they wouldn't need special [education] services". As the district court noted: "Plaintiffs do not argue that E.R. can, in fact, learn the grade level TEKS standards that they insist must be included in the IEP." *Id.* at *25.

Given E.R.'s condition, providing her an IEP with every single TEKS strand and standard would not have been individualized. To the contrary, excessive goals could have put her in a position where success would have been exceedingly unlikely. Pye considered the goals to be "'spot on'". *Id.* at *21 (citation omitted). As the district court noted: "After assessing E.R.'s abilities at the beginning of the year, . . . Pye determined that [E.R.] was able to learn some of the skills described in the goals, so they were not too ambitious, but had not mastered the goals, so they were not too easy." *Id.* (citation omitted); *see also id.* at *22 (finding the preponderance of the evidence supported the hearing officer's concluding Pye was credible). In other words, consistent with *Endrew F.*, 137 S. Ct. at 1000, they were "appropriately ambitious".

E.R. was not denied a FAPE when school officials, using their expertise, crafted an IEP designed for her unique needs. They did not give E.R. a goal in every TEKS strand and standard because there was a high likelihood she would not be able to meet those goals. As discussed, *Endrew F.* dictates E.R.'s "educational program must be appropriately ambitious in light of [her] circumstances"; and E.R. "should have the chance to meet challenging objectives". *Id.*

Notably, this standard uses "appropriately"; accordingly, it does not require ambitions beyond what may be reasonably expected given the circumstances.  The district court aptly noted E.R.'s situation:

> [I]t is undisputed that E.R. is unable to learn at grade level in any subject. She has ADHD and a low IQ, both of which affect her ability to learn. She is constantly at risk of a life threatening seizure or shunt failure, and this complicates her educational progress.

*E.R.*, 2017 WL 3017282, at *31.  Additionally, her medicines impeded her ability to learn.  Even E.R.'s expert admitted it is unnecessary to have an IEP goal for every TEKS strand.

E.R. asserts she "had other . . . non-critical academic needs that were not addressed through the IEP".  Part of E.R.'s contention rests on *dicta* from *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 749 (2017) ("[T]he IEP spells out a personalized plan to meet all of the child's 'educational needs'". (citation omitted)).  The Court in *Fry*, however, was addressing questions surrounding administrative-exhaustion, which is not presented in this action.  *Id.* at 748.  The Court even noted that the then-pending *Endrew F.* "present[ed] unresolved questions about the precise content of the FAPE standard".  *Id.* at 754 n.5.  Accordingly, *Endrew F.* informs this analysis.

The IEP standard is not perfection.  *Endrew F.*, 137 S. Ct. at 999 (citing *Rowley*, 458 U.S. at 206–07) ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." (emphasis in original)).  It simply "must aim to enable the child to make progress".  *Id.*

The district court found E.R. did so at Frostwood.  *E.R.*, 2017 WL 3017282, at *22 ("The preponderance of the evidence shows that E.R. was making progress, and was likely to master each of her IEP goals by the end of the school year, and that those goals were appropriate for her abilities.").  E.R.

progressed in reading, writing, social studies, science, and math. *Id.* at *21 (citations omitted). Again, E.R. bears the burden to show the IEP was inappropriate. *Michael F.*, 118 F.3d at 252 (footnote omitted). Considering the facts adduced by the hearing officer and district court, E.R. has not shown this by the requisite preponderance of the evidence.

b.

Procedurally, E.R. contends that, because her parents did not know the IEP was just limited to critical needs, they were unable to sufficiently participate. As a rule, parents have an "opportunity to participate in the IEP process". *Adam J.*, 328 F.3d at 812 (footnote omitted). As stated, this means SBISD cannot predetermine the outcome of the process. *R.L. ex rel. O.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1188 (11th Cir. 2014).

"Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team." *Id.* (citation omitted). "To avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parents' opinions and support for the IEP provisions they believe are necessary for their child." *Id.* (citation omitted). But, "[t]he right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such". *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003) (citations omitted).

SBISD had not predetermined the outcome of E.R.'s 2014-15 IEP at the ARDC meeting. Again, E.R.'s parents agreed with the end-result. There is no reason to believe SBISD would not have listened to, and considered, E.R.'s parents' positions about adding more goals to E.R.'s IEP. The facts are replete with accommodations made by SBISD. From a blog, to emails, to personal meetings, SBISD communicated with E.R.'s parents.

SBISD crafted the IEP based on its familiarity with E.R.   Obviously, "predetermination is not synonymous with preparation", with the latter being permissible. *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610–11 (6th Cir. 2006).   SBISD was in the "prepared" category.   The IEP did not deprive E.R. of a FAPE or educational opportunities she could reasonably be expected to handle, and SBISD included the parents in the decision process. That E.R.'s parents might not have been aware of every TEKS strand applicable to a general-education student does not translate to a procedural due-process violation when they had the opportunity to participate in crafting an individualized IEP.

Today's decision is, of course, fact-specific.   It focuses on the evidence considered by the hearing officer and district court and considers E.R.'s burden.   Based on our *de novo* review, the district court did not err in concluding E.R. received a sufficient IEP.  *E.R.*, 2017 WL 3017282, *31, *35.

3.

E.R. claims the district court erred by granting summary judgment to SBISD on the transfer from Wilchester to Frostwood without an ARDC meeting.   This contention fails under our precedent in *White. See generally White*, 343 F.3d 373.   There, our court ruled:  even though "parents must be involved in determining 'educational placement'", they do not have to "be involved in site selection".  *Id.* at 379.   "'Educational placement', as used in the IDEA, means educational program—not the particular institution where that program is implemented."  *Id.* (citing *Sherri A.D. v. Kirby*, 975 F.2d 193 (5th Cir. 1992); *Weil v. Bd. of Elem. & Secondary Educ.*, 931 F.2d 1069 (5th Cir. 1991)).

In attempting to distinguish *White*, E.R. contends:   her parents participated in the ARDC process that approved Wilchester; therefore, because

of E.R.'s health problems, they should have been consulted before the transfer to Frostwood.  Our court noted in *White*:

> Moreover, that the parents are part of the IEP team and that the IEP must include location is not dispositive. The provision that requires the IEP to specify the location is primarily administrative; it requires the IEP to include such technical details as the projected date for the beginning of services, their anticipated frequency, and their duration. *See* 20 U.S.C. § 1414(d)(1)(A)(vi).

*Id.*

Implicitly realizing this uphill battle, E.R. falls back by noting the parents in *White* did discuss site-placement at their IEP meeting.  We need not reach this point because our court has already endorsed the "better view" that "'placement' does not mean a particular school, but means a setting (such as regular classes, special education classes, special schools, home instruction, or hospital or institution-based instruction)". *Id.* at 380.  E.R. has not shown "any evidence of bad faith exclusion . . . or refusal to listen or to consider [E.R.'s parents'] input". *Id.*

4.

E.R. asserts SBISD denied her a FAPE by removing her from the mainstream science class without first notifying E.R.'s parents.  *See* 20 U.S.C. § 1415(b)(3) (discussing prior notice); *id.* § 1415(f)(3)(E)(ii) (discussing when a child is denied a FAPE *via* procedural inadequacies).  In that regard, E.R. maintains, without citation, that a "loss of educational opportunity is presumed whenever a child is removed from the least restrictive environment to a more restrictive setting".  E.R. asserts:  her parents were excluded from the decision; and this constitutes a procedural violation.

Importantly, E.R.'s parents signed the 2014-15 IEP effectuating this change.  As stated in the IEP, their signatures affirm they "[were] present at

the ARDC meeting, participated in the discussion, and [understood] what was discussed". The minutes state: "Modifications and Accom[m]odations were reviewed and updated". They also state "[E.R.] will access a specializes [sic] support classroom with time in the general education classroom during fine arts time"—*not* "general education classroom time during fine arts and science time". The minutes were "read and agreed upon". Although E.R. contends her parents never discussed the science-class transfer, this is belied by the IEP bearing their signatures.

Nonetheless, the district court stated: "It is impossible to tell . . . whether the ARDC explicitly discussed E.R.'s removal from science". *E.R.*, 2017 WL 3017282, at *23. But, even if SBISD erred in the prior-notice requirement, the error did not "impede[] [E.R.'s] right to a free appropriate public education", "significantly impede[] the parents' opportunity to participate in the decisionmaking process", or "cause[] a deprivation of educational benefits". 20 U.S.C. § 1415(f)(3)(E)(ii).

E.R. received a FAPE. The parents participated in the decision-making process both on larger issues (*i.e.*, crafting an IEP) and smaller ones (*i.e.*, morning drop-off) alike. And, we reject E.R.'s stated broad rule by which our court would presume a loss of educational opportunity anytime "a child is removed from the least restrictive environment to a more restrictive setting".

As the district court aptly noted, the evidence showed E.R. needed a different pace in her science class. *E.R.*, 2017 WL 3017282, at *23. Although IDEA contains a preference for mainstreaming children, that preference is not absolute. 20 U.S.C. § 1412(a)(5) (noting children should be mainstreamed "[t]o the maximum extent appropriate"). If a child would struggle in a mainstreamed class to the extent "education in regular classes . . . cannot be achieved satisfactorily", then mainstreaming is not appropriate. *Id.* Based on our clear-error review, the district court did not err in finding the evidence

No. 17-20494

showed this was such a case. *See E.R.*, 2017 WL 3017282, at \*23 (stating E.R. did not lose an educational opportunity because of the science-class transfer).

5.

E.R. contends:  SBISD denied her a FAPE when it did not, *sua sponte*, prepare a new IEP for the 2015-16 school year, *after* her unilateral transfer to Briarwood.  The district court disagreed, ruling "SBISD offered E.R. a FAPE during the 2014-2015 and 2015-2016 school years", and E.R.'s parents had given a "near unequivocal rejection of public placement".  *Id.* at \*33.

On 24 April 2015, E.R.'s 2014-15 IEP expired.  But, by that date, E.R. was enrolled at Briarwood.  E.R. contends SBISD had an affirmative duty to craft an IEP, even though E.R. was at Briarwood, because her IDEA due-process claims were under administrative review.

We need not address whether SBISD should have *sua sponte* convened an ARDC meeting to form a new IEP for the 2015-2016 school year.  Even assuming SBISD erred in not doing so, this error did not "impede[] [E.R.'s] right to a free appropriate public education", "significantly impede[] the parents' opportunity to participate in the decisionmaking process", or "cause[] a deprivation of educational benefits".  20 U.S.C. § 1415(f)(3)(E)(ii).  The district court found the preponderance of the evidence supported finding E.R.'s parents made a "near unequivocal rejection of public placement".  *E.R.*, 2017 WL 3017282, at \*33. This finding was not clear-error.  *Adam J.*, 328 F.3d at 808 (footnote omitted); *see also Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 451 n.9 (2d Cir. 2015) ("A local educational agency may not be required to offer an IEP if the parent's expressed intention is to enroll the child in a private school outside the district, without regard to any IEP.").  This is different from the case where a school board "refused to propose an IEP".  *See Doe*, 790 F.3d at 450.

No. 17-20494

As soon as it appeared E.R.'s parents even might be interested in creating a new IEP, SBISD convened an ARDC meeting to do so. It was held in August 2015; E.R.'s parents attended; and E.R. had an IEP before the start of the next school year. E.R. points out her parents renewed E.R.'s enrollment at Briarwood during June 2015, while E.R. did not have an active IEP. But, this was several months before the school year started and during the period when it appeared E.R.'s parents would not return E.R. to SBISD, regardless of an IEP.

## D.

E.R.'s final contentions are that "[t]he district court erred in failing to" reach whether Briarwood was an appropriate placement, and that the hearing officer erred by finding Briarwood was inappropriate. "To receive reimbursement, a disabled child's parents must prove that (1) an IEP calling for placement in a public school was inappropriate under IDEA, *and* (2) the private placement was proper under the Act." *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 293 (5th Cir. 2009) (emphasis added) (citations omitted). As emphasized, both prongs must be met. *Rockwall Indep. Sch. Dist. v. M.C.*, 816 F.3d 329, 339 (5th Cir. 2016) (citation omitted). The district court did not reach the second prong after concluding E.R. failed to satisfy the first. *E.R.*, 2017 WL 3017282 at *35. For the same reason, it is not necessary to address this prong.

## III.

For the foregoing reasons, the judgment is AFFIRMED.