# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 16, 2019

No. 17-20750

Lyle W. Cayce
Clerk

RENEE J., as parent/guardian/next friend of C.J., a minor individual with a disability; CORNELIUS J., as parent/guardian/next friend of C.J., a minor individual with a disability,

Plaintiffs - Appellants

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The district court ruled in favor of Houston Independent School District ("HISD") on multiple claims brought by the Appellants under the Individuals with Disabilities in Education Act ("IDEA"). We find no procedural or substantive violations of the law or its implementing regulations. The judgment is AFFIRMED.

I.

The Appellants, parents of C.J., allege that HISD failed to provide him with a Free Appropriate Public Education ("FAPE") as required by the IDEA.

No. 17-20750

C.J. is a seventeen-year old male student who has been diagnosed with Autism, intellectual disabilities including an IQ of 51, and Attention Deficit Hyperactivity Disorder ("ADHD"). He received no formal diagnosis until he was twelve years old and no specialized treatment plan until he was fifteen. He currently reads at a first-grade level. C.J. also has difficulty regulating his emotions and has allegedly been bullied at school.

C.J.'s Individualized Education Program ("IEP") for the 2013–14 school year (his seventh-grade year) revealed that he had not been tested at the district-wide level since third grade and that his math and reading comprehension levels were below those of the average second-grader. When C.J. began eighth grade, however, his district-wide test results from third grade were again carried over to his IEP. C.J.'s "transition planning" program (a program required for students receiving IEPs under the IDEA) focused on preparing C.J. for a career as a police officer—as it did for several years—even though C.J.'s autism and other learning disabilities render such a career impossible.

In January 2015, shortly after the beginning of the second semester of the 2014–15 school year (C.J.'s eighth-grade year), C.J. had an outburst at home that included repeatedly banging his head and hitting himself in the face. C.J. told his mother that two of the teacher's assistants in his classroom were bullying him and mocking his disabilities.

C.J.'s parents wrote a formal complaint to the principal of C.J.'s school, and school authorities arranged a meeting the same day. At the meeting, C.J.'s parents requested homebound instruction for C.J., and school administrators provided C.J.'s parents with forms to complete that would trigger a formal investigation. They also provided additional information about homebound educational services. C.J. ceased attending school altogether a few days later.

No. 17-20750

The parties disagree about the events that took place after this meeting. HISD requires a completed homebound services packet and a physician's statement before an Admission, Review, and Dismissal ("ARD") committee can meet and recommend homebound services for students with IEPs. HISD contends that C.J.'s parents delayed filling out the paperwork necessary to certify his eligibility for homebound care and voluntarily kept C.J. from attending school. C.J.'s parents characterize these forms as procedural irrelevancies and instead point to the initial documentation they provided, which HISD rejected.

C.J.'s parents provided a note from C.J.'s physician on February 5, 2015 stating that C.J. suffered from "severe mental illness" and recommending 2–6 weeks of immediate partial hospitalization, followed by a 6–12-week trial period of homebound instruction. After receiving the letter, HISD sent a form to the family's physician that administrators said was required to trigger an ARD meeting. Shortly after the form arrived, C.J. underwent an unrelated surgery that required a week of hospitalization. C.J. remained home from school after his surgery, but neither his parents nor his physician provided the requested documents to HISD until mid-April. HISD officials repeatedly followed up with C.J.'s parents, asking them to return him to school. C.J.'s parents finally provided an updated letter from his physician on April 10, 2015 stating that C.J.'s risk factors put him at a "moderate" risk for suicide and again recommending homebound instruction.

HISD held an ARD Committee meeting on April 30 to evaluate C.J.'s request for homebound instruction. The committee denied the request because it concluded that C.J. was able to attend school. School administrators questioned the sincerity of the updated letter, partly because the physician wrote that he was "told to specify other more severe reasons as to why this patient required home bound schooling," and partly because the physician's

3

medical license was previously restricted "due to unprofessional or dishonorable conduct" likely to deceive, defraud, or injure the public.

C.J. returned to school for one day on May 1, 2015, and his teachers reported that he appeared happy to be back. Nevertheless, C.J. did not return to eighth grade after May 1. Overall, C.J. missed almost his entire second semester of eighth grade.

The ARD committee met on June 11, 2015 and approved C.J.'s promotion to ninth grade but recommended that he participate in Extended School Year ("ESY") classes over the summer. C.J.'s parents were present at meetings when his eligibility for ESY programming was discussed and were formally notified by voicemail and email on June 18 that he could begin ESY classes on June 22. By June 22, however, the summer session was nearly over, and C.J. was not able to participate in ESY as a result.

C.J. began ninth grade in fall 2015. His attendance was inconsistent and marked by altercations with other students and multiple stints in full-day counseling programs instead of classes. C.J.'s teachers reported that he was making "great progress," but his advancement was impeded by his infrequent attendance. In spring 2016, C.J.'s parents hired an independent psychologist to assess C.J.'s IEP. The family's psychologist recommended that C.J.'s IEP include the use of Applied Behavioral Analysis ("ABA"), which is one of several therapeutic methods of instruction for children with autism. HISD does not use ABA programs as such, but it does incorporate some ABA methods into its approach.

C.J., through his parents, filed a request for an administrative due process hearing under the IDEA on December 8, 2015, alleging that HISD failed to provide him a FAPE during his eighth and ninth-grade years. A four-day hearing took place between May 31 and June 6, 2016. The hearing officer considered the testimony of twenty-one witnesses and approximately 2,800

pages of exhibits. Both parties submitted written closing arguments. The hearing officer made credibility determinations to resolve conflicting accounts provided by C.J.'s parents and school personnel. For example, the hearing officer concluded that C.J.'s lack of attendance during the spring of 2015 was caused by his parents' refusal to send him to school, not by HISD's failure to have an appropriate program in place for his education. The hearing officer ultimately concluded that HISD provided C.J. with a FAPE even though its performance had been imperfect.

C.J.'s parents sought review of the hearing officer's decision in federal district court, but the district court upheld the hearing officer's determinations and granted summary judgment to HISD on all counts. C.J.'s parents timely appealed to this court.

## II.

This court "review[s] de novo, as a mixed question of law and fact, a district court's decision that a local school district's IEP was or was not appropriate . . . ." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997) (footnote omitted). As part of that review, "[t]he district court's findings of underlying fact, such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error." *Id.* (footnote omitted). Under clear error review, a factual finding of the trial judge may be reconsidered when, after reviewing all of the evidence, this court is "left with the definite and firm conviction that a mistake has been committed." *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (internal quotation marks and citation omitted). "[A] party attacking the appropriateness of an IEP established by a local education agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." *Michael F.*, 118 F.3d at 252 (footnote omitted).

No. 17-20750

III.

The "IDEA requires states and local educational agencies receiving federal IDEA funds to make a [FAPE] available to children with certain disabilities." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (en banc). A FAPE includes both "special education" and "related services." 20 U.S.C. § 1401(9). "'Special education' means specially designed instruction . . . to meet the unique needs of a child with a disability." *Id.* at § 1401(29). "Related services" are services "required to assist a child to benefit from" instruction. *Id.* at § 1401(26).

Schools provide students a FAPE based on IEPs unique to each child. *Id.* at § 1401(9)(D). An IEP is a "written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and when appropriate, the child himself." *Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 989 (5th Cir. 2014) (quoting *Michael F.*, 118 F.3d at 247). The "IEP must be drafted in compliance with a detailed set of procedures . . . emphasiz[ing] collaboration among parents and educators" and the need for tailoring to the unique needs of the child. *Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 994 (2017).

If a child is unable to attend classes due to his or her disability, the school district must offer homebound instruction to provide the child with a FAPE. 20 U.S.C. § 1401(25)(A) (stating that special education includes, if necessary, "instruction conducted . . . in the home"). An IEP must also include "transition services" designed to "facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment . . . independent living, or community participation." 34 C.F.R. § 300.43(a).

This court uses a four-factor test established in *Michael F.* to evaluate whether an IEP complies with the IDEA. The factors include whether (1) the

No. 17-20750

student's "program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." 118 F.3d at 253. This court has "never specified precisely how these factors must be weighed," *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009), but it has long held that the fourth factor is critical. *See R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813–14 (5th Cir. 2012).

In 2017, the Supreme Court held in *Endrew F.* that, to meet its substantive burden under the IDEA, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's unique circumstances." 137 S. Ct. at 999. This court recently reaffirmed the validity of the *Michael F.* test in light of *Endrew F. See E.R. v. Spring Branch Indep. Sch. Dist.*, 2018 WL 6187765, -- F.3d -- (5th Cir. Nov. 28, 2018) (per curiam).

IV.

Appellants essentially raise four claims on appeal. First, HISD's refusal to provide ABA services denied C.J. a FAPE by predetermining his treatment plan instead of developing it according to his unique, individual needs. Second, HISD denied C.J. a FAPE by failing to provide adequate Prior Written Notice to C.J.'s parents about his eligibility for summer school classes. Third, HISD failed to protect C.J. from bullying such that C.J.'s refusal to attend school amounted to denying him a FAPE (a "school refusal" claim). Finally, HISD

7

denied C.J. a FAPE by providing a transition plan that was entirely inappropriate for his needs and abilities.[1]

*1. ABA Predetermination*

C.J.'s parents and *amici* contend that HISD's failure to use ABA programs denied C.J. a FAPE by predetermining his special education recommendations instead of considering his unique needs. "Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team." *Spring Branch Indep. Sch. Dist.*, 2018 WL 6187765 at \*12 (internal quotation marks and citation omitted). "To avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parents' opinions and support for the IEP provisions they believe are necessary for their child." *Id.* (internal quotation marks and citation omitted). But this court has also held that "[t]he right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such." *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003) (citations omitted).

Appellants' argument is formalistic at best. Both sides agree that although HISD does not expressly provide Applied Behavioral Analysis, it incorporates techniques from ABA and other methods into its approach. Moreover, the district court reviewed the record and concluded that "C.J.'s teachers, mother, and other participants in [C.J.'s ARD meeting] did discuss the Texas Autism Supplement requirements." *Renee J. v. Houston Indep. Sch. Dist.*, No. 4:16-cv-02828, slip op. at \*10 (S.D. Tex. Nov. 1, 2017). The district

---

[1] Appellants also contend that C.J. was denied adequate vision screening and instruction, but they cast no doubt on the school district's finding that C.J.'s vision test results were satisfactory even without glasses.

court also determined that "[t]he record does not show that C.J.'s parents specifically asked the District to use Applied Behavioral Analysis in devising and implementing his Individualized Education Plan." *Id.* at 9–10.  Thus, C.J.'s parents cannot meaningfully claim that his IEP was predetermined.

Finally, this court would adopt the problematic role of education policymaker if it were to dictate which pedagogical methods a school district must consider and to what degree they must be incorporated on an individualized, case-by-case basis—an outcome the Supreme Court has specifically cautioned against. *See Endrew F.*, 137 S. Ct. at 992–93; *Bd. of Ed Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207, 102 S. Ct. 3034, 3051 (1982) ("[C]ourts must be careful to avoid imposing their view of preferable education methods.").  The district court did not err in rejecting this claim.

### 2. Prior Written Notice

C.J.'s parents assert that HISD committed a procedural violation of the IDEA by failing to provide them prior written notice regarding HISD's recommendation that C.J. attend ESY classes.  The IDEA requires a school district to provide such notice to parents of children who have IEPs whenever it proposes or refuses "to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child." 34 C.F.R. § 300.503(a)(1).  Parents must have adequate notice of a school or school district's decision before it is implemented.  *See* 34 C.F.R. § 300.503(b). Even when a procedural violation occurs, however, "procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity." *Spring Branch Indep. Sch. Dist.*, 2018 WL 6187765 at *9 (internal quotation marks and citation omitted).

HISD held an ARD meeting to discuss C.J.'s IEP on June 11, 2015 and informed C.J.'s parents on June 18 that C.J. was eligible for ESY and could

begin on June 22. C.J.'s parents allege that when they contacted the school that was supposed to provide ESY services, however, the school had no knowledge of C.J.'s approval and informed them that the ESY term was already nearly over. C.J.'s parents contend that they were "unsure whether or not C.J. was being offered ESY services" because the exact details, such as the location of the classes, were not immediately clear. The failure to communicate, they allege, did not satisfy the IDEA's prior written notice standard.

HISD disputes C.J.'s parents' version of the facts. HISD alleges that C.J.'s parents did have adequate notice but simply decided that C.J. would not participate in ESY classes, just as they had decided that he would not attend classes for most of the previous semester. The district court and the hearing officer reviewed the facts and agreed with HISD. Indeed, the record shows that school administrators made several unsuccessful attempts by email and phone messages to contact C.J.'s parents and confirm final details of his ESY. Appellants have not shown clear error in the district court's finding that sufficient notice was provided.

### 3. School Refusal

C.J.'s parents also allege that HISD denied C.J. a FAPE by failing to convene a timely ARD meeting to address his bullying concerns and by allowing him to be bullied so extensively that he refused to attend school altogether. This "school refusal" claim has been recognized as a proper vehicle for a cause of action under the IDEA by a few courts in other circuits. *See, e.g.*, *T.K. v. N.Y. City Dep't of Educ.*, 810 F.3d 869 (2d Cir. 2016). It is undisputed that C.J. has gotten into altercations with other students—sometimes C.J. reacted to statements from those students and sometimes other students responded to things C.J. said to them. It is also undisputed that C.J. has experienced bouts of anxiety about attending school because of some of these

altercations. The parties characterize the school's response differently, however. C.J.'s parents argue that the school district did little to prevent bullying, while the school district points to several offers it made to accommodate C.J.'s needs and to more than two dozen overtures to C.J.'s parents attempting to convince them to return him to school.

The credibility assessments of the hearing officer and district court each resolved the disputes in favor of HISD. From February to June, C.J.'s teacher communicated with his parents nearly thirty times, attempting to convince them to return him to school. Administrators arranged for C.J.'s teacher to meet him at the car when his parents dropped him off and to escort him inside the school building, so he would feel safe. School officials also offered to allow C.J. to spend the first hour of the day in the office of student support to ease his transition to the school environment. These facts belie the parents' claims that teachers and school administrators were callous and unresponsive to C.J.'s fears about bullying. Furthermore, C.J.'s parents admit that C.J. "was willing to go back to his current school, so the counselor worked with him on coping skills."

Perhaps the most significant factual disagreement between the two sides, however, stems from differing professional opinions about C.J.'s mental state and his demonstration of Post-Traumatic Stress Disorder symptoms. C.J.'s doctor initially wrote a letter describing his psychological condition and recommending homebound instruction on February 2, 2015. Despite district officials' repeated requests for more specific information, they did not receive an updated letter describing C.J.'s more severe symptoms until well over a month later, on April 10. When officials finally received the necessary documents, they scheduled an ARD meeting, but by then, C.J. had already been out of school for most of the semester. On these facts, it is difficult to conclude that the school district denied C.J. a FAPE.

No. 17-20750

The Supreme Court reiterated in *Endrew F.* that "the question is whether an IEP is *reasonable*, not whether the court regards it as ideal." 137 S. Ct. at 999 (emphasis original) (citation omitted).  Considering C.J.'s parents' failure to follow up with the requested paperwork for five weeks while they continued to withhold him from school, and considering further the school district's repeated outreach and offers of accommodation, the school district's behavior was reasonable.  The district court's ruling rejecting this claim is not erroneous.

*4. Transition Plan*

Finally, C.J.'s parents argue that HISD denied C.J. a FAPE by failing to provide him with an appropriate transition plan. One of the purposes of the IDEA is "[t]o ensure that all children with disabilities have available to them a free appropriate public education that . . . prepare[s] them for further education, employment, and independent living."  34 C.F.R. § 300.1(a).  To that end, the IDEA requires schools to provide students with disabilities with meaningful "transition services" to prepare them for adult life to the extent practicable.  34 C.F.R. § 300.43(a).  Those transition services must include "*appropriate measurable postsecondary goals* based upon age appropriate transition assessments related to training, education, employment, *and, where appropriate, independent living skills; and…the transition services (including courses of study) needed to assist the child in reaching those goals.*" 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) (emphases added).  C.J.'s parents argue that HISD's years-long focus on preparing C.J. for a post-secondary career as a police officer deprived him of a FAPE, because "[c]hildren with autism do not grow up to be police officers."

HISD does not dispute that C.J.'s post-secondary transition goal has been focused on law enforcement careers since at least 2013, but the school district explains that his transition plan was nevertheless "specifically

12

designed to assist C.J. to develop the skills he needs to successfully transition to post-secondary life." HISD contends that focusing on a career as a police officer was "clearly appropriate" because it was "C.J.'s primary area of interest." (One of C.J.'s IEP documents, for example, noted that he was "interested in a career in law enforcement, such as a police officer, SWAT team member, or FBI agent.") C.J.'s transition plan included assignments such as "research[ing] 3 sub careers" in law enforcement and "identify[ing] 3 work habits necessary to be successful in the field of law enforcement." The transition plan also called for C.J. to conduct online research to learn about "3 colleges that have degree programs in law enforcement/criminal justice."

But C.J.'s transition plans after he began ninth grade also included additional, more basic transition goals that were not included in his initial transition plan. Among those goals were "work[ing] part time while attending school," attending "a community college or trade school," "independently prepar[ing] for work each day, including dressing, making his bed, making his lunch, and accessing transportation," participating "in recreational activities at the local YMCA," "making simple meals," "counting money and making purchases," reading bus schedules, and sorting his clothes and doing laundry.

Although it is certainly reasonable to believe that C.J.'s disabilities render his prospects of becoming a police officer improbable, autism is a spectrum and so is the set of skills needed for his daily living as well as various jobs. This court is mindful of its obligation not to stray into the field of education policymaking and is reluctant to say, as a matter of law, that HISD was required to communicate a nuanced transition plan in a different way. The evidence reflected that HISD attempted to collaborate with C.J.'s parents in preparing the transition plan. Significantly, C.J.'s later transition plans attempted to engage his principal future employment interest while developing

basic life skills necessary for post-secondary life.  Thus, we affirm the district court's decision that C.J.'s transition plan did not deny him a FAPE.

## V.

For the foregoing reasons, we **AFFIRM** the district court's judgment.