# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
March 6, 2020

Lyle W. Cayce
Clerk

————

No. 19-50007

————

A. A., As Parent/Guardian/Next Friend of Student, K.K., A Minor Individual with a disability,

     Plaintiff - Appellant

v.

NORTHSIDE INDEPENDENT SCHOOL DISTRICT,

     Defendant - Appellee

————

Appeal from the United States District Court
for the Western District of Texas

————

Before STEWART, CLEMENT, and HO, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Plaintiff-Appellant A.A. ("Parent") brought suit on behalf of her minor child, K.K. ("Student"), against Northside Independent School District ("NISD") in San Antonio, Texas for alleged procedural and substantive violations of the Individuals with Disabilities Education Act ("IDEA") (20 U.S.C. §§ 1400 *et seq*.), seeking compensatory educational services as a remedy. For the reasons set forth herein, we AFFIRM the district court's denial of Parent's motion for summary judgment and its grant of NISD's motion for summary judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Because there is no set of undisputed facts in this case, and no facts set forth in the district court's memorandum order, we discuss the pertinent facts from the record on appeal and the updated information provided by the parties at oral argument. When this litigation was initiated, Student was ten years old and in the fifth grade. The facts below are during his third and fourth grade years (2015–2017).

### A. Facts

Student is a child diagnosed with serious emotional disturbance and other disabilities, eligible for special education and related services pursuant to the IDEA. Over the years, Student has received several diagnoses of different mental disabilities from a variety of medical and mental health professionals. Those diagnoses include, *inter alia*, Pediatric Bipolar 1 Disorder (Severe with Psychotic symptoms); an unspecified disorder along the Autism Spectrum, ADHD/Combined type (Severe); Mood disorder; and an unspecified language disorder. Between the ages of three and seven, Student had been hospitalized eight times.

Prior to Student's enrollment in NISD, Student was enrolled in Klein ISD, where he attended the Klein Therapeutic Education Program, a self-contained campus[1].  Student then enrolled in NISD in the spring of 2015

---

[1] According to Public School Review, a self-contained classroom is one that helps "foster enhanced support for students with special needs or specific difficulties" that are typically "comprised of about ten students with unique struggles who are most commonly instructed by a lead teacher with a certification in special education." Grace Chen, *Understanding Self-Contained Classrooms in Public Schools*, PUBLIC SCHOOL REVIEW (Dec. 7, 2018), https://www.publicschoolreview.com/blog/understanding-self-contained-classrooms-in-public-schools. According to Klein ISD's landing page for the Klein Therapeutic Education Program, the center was founded in 1996 with the mission of "helping all students acquire the academic, social, and behavioral skills necessary for general education participation." Klein Independent School District, *Klein Therapeutic Education Program, Mission Statement/School Family History*, KLEIN INDEP. SCH. DIST., https://tep.kleinisd.net/our_school/mission_statement__school_family_history (last visited

during the second semester of second grade. Parent alleges that NISD eliminated nearly all of Student's special education services without cause, including his counseling services. That semester, Student spent approximately 23 days in the hospital and finished the school year in Laurel Ridge Treatment Center.

In the third grade (2015–2016 academic year), Student was privately evaluated and diagnosed with a host of mental health disorders. In February 2016, Student's Admission, Review, and Dismissal Committee ("ARD Committee"/"IEP Team"/"ARDC") met and determined that he would only receive three hours of specialized behavior support per week per course in a self-contained setting. The ARD Committee developed Student's Individualized Education Program ("IEP") based upon review of his present levels of academic achievement and functional performance ("PLAAFP"), his strengths and weaknesses in each subject, in addition to his behavior and functional skills, occupational therapy evaluation, a functional behavior assessment ("FBA"), and input from his teacher and Parent. No counseling services or extended school year services were offered at this time. By the summer of 2016, Student had been hospitalized twice for 28 days for exhibiting behaviors that indicated self-harm or harm done to others. It was during this time that Student was also diagnosed with schizoaffective disorder–bipolar type, in addition to the bevy of his prior diagnoses.

---

Feb. 28, 2020). Back in 1996, the Therapeutic Education Program had "the major focus of socializing students to normative standards in terms of interpersonal skills with peers and adults, to teach classroom behaviors that promote learning, and to encourage problem solving skills that eschew violent and aggressive strategies" and has evolved to providing "intense intervention for students with a variety of disabilities." *Id.* As a facility solely focused on the education and development of children with severe emotional, behavioral, and academic disabilities across a wide spectrum, Klein Therapeutic Education Program is a self-contained campus.

Student returned to NISD in August 2016 and began the fourth grade at Timberwilde Elementary School. He was initially placed in an Applied Learning Environment ("ALE") classroom. It was during this year that Student was hospitalized 81 out of the 176 days of the regular 2016–2017 academic year. As a result, Student only attended NISD about 46 days during the entire 2016–2017 academic year.

On October 11, an ARDC meeting was convened to discuss Parent's requests for evaluations of Student for specific learning disabilities, speech and language, occupational therapy, and a psychological evaluation. It was in this meeting that NISD and Parent agreed that NISD would conduct a full individual evaluation ("FIE") of Student. A few weeks later, the ARD Committee changed Student's classroom setting to a Behavior Mastery Content ("BMC") classroom with the support of an instructional assistant.[2] On November 3, Student reported to the school counselor that he was "seeing little dots that make shapes like a blood with a heart." He also said that he "tried to harm Ms. Sylvia with a piece of paper today . . . I've been drawing stuff like murder (guns, knives, eagles)."  In that visit to the school counselor, Student requested to "see a doctor like one you can talk to." On that same day, Student was privately hospitalized at Clarity Child Guidance Center for suicidal/homicidal ideation for 13 days. Upon his discharge from Clarity on November 16, Student was readmitted there the next day.

On November 18, NISD conducted the FIE where it was determined that he qualified for speech services for pragmatic, social, and expressive language disorders. However, despite stating that Student had "processing weaknesses that correspond with academic weaknesses," NISD concluded that Student did

---

[2] The exact date of this meeting is unclear. Parent asserts the meeting was held and the change made on October 24, 2016. NISD asserts this meeting took place on October 20, 2016 and that the classroom setting changes were made due to Parent's concerns.

not fit the profile of a student with cognitive disabilities who required further evaluation. Then on December 1, 2016, Parent placed Student in the San Marcos Treatment Center for 34 days where Student received direct counseling services, direct speech therapy, and occupational therapy services. The evaluation conducted by Dr. John Rust noted that "Student's aggressive behaviors severely disrupt his family, academic, and social functioning." Another ARD Committee meeting was held on that same day, but Parent alerted the ARD Committee that she would not be in attendance.

Student returned to NISD at Holmgreen Center without any counseling services or in-home services. On January 30, 2017, a behavior intervention plan ("BIP") was implemented for the first time "in which all boxes were checked and the behaviors targeted did not match Student's behaviors such as sleeping to avoid tasks. Rather than working on Student's avoidance behaviors . . . the [BIP] continued to focus on minor issues such as 'blurting out.'" On March 30, Parent received an email from Student's teacher, Ms. Fontenot, informing her that Student would be moved to a classroom with fourth and fifth grade students on the following Monday because the school was "expecting several new students to [arrive] next week." The new teacher's name was Ms. Ysaguirre.

A few weeks later, NISD conducted a counseling evaluation on April 11 and a dyslexia evaluation on April 18. The ARD Committee reviewed the results of those evaluations on May 19, finding that Student was dyslexic and qualified for counseling services. Still, NISD did not propose an IEP that included services related to dyslexia or counseling as the ARD Committee did not reach a consensus which left Student without those services. NISD then contracted Dr. Lindsay Heath to conduct an independent educational evaluation ("IEE") upon Parent's request after a failed attempted evaluation

by Dr. Anne Esquivel. Student's behaviors were so dangerous that Dr. Heath could not complete the IEE.

Parent then requested a special education hearing which was held on August 30 through September 1, 2017. The Special Education Hearing Officer ("SEHO") found in favor of NISD on all issues. Following the special education hearing, Student became homeless following an altercation in the home with Parent. Student's step-father, Parent's husband, was arrested. In a series of unfortunate events, Student was hospitalized, assaulted his mother and a nurse, and ran out of the emergency room. Experts at Texas Children's Hospital believed that Student needed to be in a residential treatment facility. Parent requested NISD to reconsider residential placement on January 29, 2018 but no ARD Committee meeting was convened.

At that point, Parent notified the Texas Department of Family and Protective Services that she was unable to care for her child's "extra-ordinary mental-health needs" and initiated a Refusal to Accept Parental Responsibility Case in order to get Student the intense mental-health services he needed. At oral argument, counsel for Parent established that Student is no longer living at home and is now stabilized in a residential facility, located within the Klein ISD, where his biological father has visitation rights.

## B. Procedural History

Parent filed a complaint in the Western District of Texas on November 26, 2017. Following two amendments to the complaint, NISD filed an answer. Throughout the course of litigation, Parent filed three motions for additional evidence and later filed a motion for summary judgment. Then, NISD filed a cross-motion for summary judgment. On December 10, 2018, the district court granted all three of Parent's motions for additional evidence along with NISD's motion for summary judgment and denied Parent's motion for summary judgment. Parent timely appeals the district court's decision to grant NISD's

summary judgment motion and the denial of her own motion for summary judgment. Additionally, Parent also asks this court to order NISD to provide compensatory educational services.

## II. STANDARD OF REVIEW

Motions for summary judgment are reviewed de novo. *Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 225 (5th Cir. 2017). Summary judgment is appropriate where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When parties file cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (cleaned up).

This court reviews de novo, as a mixed question of law and fact, a district court's decision on the appropriateness of an IEP under the IDEA. *Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 528 (5th Cir. 2019). The party challenging the IEP must show why the IEP and placement were insufficient under the IDEA. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997). Underlying findings of fact are reviewed for clear error. *Id.* Decisions such as if a student obtained an educational benefit from a school's special education services are underlying findings of fact. *Id.* Under clear error review, a factual finding may be reconsidered when, after reviewing all of the evidence, the court is "left with the definite and firm conviction that a mistake has been committed." *Renee J.*, 913 F.3d at 528 (quoting *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015)).

## III. DISCUSSION

### A. No Procedural IDEA Violations

Parent argues that the district court committed clear error when it found that she did not meet her burden of showing that the school district violated the procedural requirements of the IDEA. We disagree.

"Procedural defects alone do not constitute a violation of the right to a [free appropriate public education] unless they result in the loss of an educational opportunity." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003) (quoting *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090, 1095 (10th Cir. 2001)). In other words, the procedural error must impact the substantive outcome(s) of the child's IEP. The IDEA limits hearing officers to making decisions on substantive grounds and provides them a non-conjunctive factor test to determine when, if at all, a procedural defect rises to the level of an IDEA violation. The procedural defect must have "(I) impeded the child's right to a free appropriate public education ["FAPE"]; (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

First, Parent avers that NISD was obligated to evaluate Student much earlier and that her evaluation requests for speech, learning disability and counseling services were made but not fulfilled until much later. Parent also argues that these delays procedurally violated the IDEA because they ultimately denied Student a FAPE. We disagree.

The IDEA requires school districts to conduct reevaluations of currently enrolled special education students. *See* 20 U.S.C. § 1414(a)(2). A district must reevaluate a student if (1) the district "determines that the educational or related services needs . . . of the child warrant a reevaluation" or (2) "the child's

parent or teacher requests a reevaluation." 34 C.F.R. § 300.303(a). Unless the parent and school district agree otherwise, a reevaluation may not occur sooner than a year after a prior evaluation and must occur at least every three years. 34 C.F.R. § 300.303(b). When a reevaluation is conducted, the school district must ensure the evaluation "is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child is classified." 34 C.F.R. § 300.304(c)(6).

Here, Parent argues that NISD committed a procedural violation by delaying Student's reevaluation for an unreasonable period of time after Parent requested it. Although Parent acknowledges that the IDEA does not prescribe a time limit for conducting a reevaluation, she urges this court to adopt the untimely evaluation standard used in the child find context of the IDEA, where a four-month delay in evaluating a student is considered unreasonable and thus constitutes a procedural violation. *See Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673 (5th Cir. 2018) (finding that a four month delay in evaluating a child to determine if she needed special education services was unreasonable and in violation of the IDEA's child find requirement because the child's behavioral incidents coupled with her academic decline put the school district on notice that the child needed an IEP).

It is unnecessary to decide whether the timeliness requirements used in the child find context must be imposed on a school district in the reevaluation context. Even assuming that a four-month gap between when a parent requests a reevaluation and when a student receives a reevaluation constitutes an unreasonable delay resulting in a procedural violation, Parent has failed to demonstrate that such a delay occurred.

Parent avers that the speech evaluation that was initially requested in February 2016, was denied, and then was requested a second time on

September 29, 2016 which was fulfilled. At the due process hearing, NISD asserted the application of the one-year statute of limitations. *See* 19 TEX. ADMIN. CODE 89.1151(c); *see also Marc V. v. N. E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 590–91 (W.D. Tex. 2006) *aff'd sub nom. Marc V. ex rel. Eugene V. v. N. E. Indep. Sch. Dist.*, 242 F. App'x 271 (5th Cir. 2007) (per curiam). This statute of limitations applies to the timeline to request an impartial due process hearing. Indeed, the SEHO set the accrual date for the action as May 12, 2016 without contest from either party. So, Parent's February 2016 request for speech therapy is barred by the statute of limitations. But, the September 2016 requests for a learning disability evaluation and Student's November 2016 request for an evaluation for counseling services are within the statute of limitations and are not time-barred. We analyze those two requests in turn.

Parent claims to have made both requests for counseling and learning disability around the same time, September 2016. The September request for a learning disability evaluation was discussed at the October 11, 2016 ARD Committee meeting where Parent was told that NISD would conduct a FIE. NISD conducted the FIE on November 18, 2016, only two months after Parent's reevaluation request. Parent also argues that Student's academic and behavioral progress and the results of the FIE indicating that Student experienced processing weaknesses should have been an indicator that additional and more pointed evaluation was required. Though the learning disability assessment was not specific enough to pinpoint that Student was dyslexic, the point of the FIE was to determine whether additional services or further evaluation were needed. The FIE indicated that Student did not need additional evaluation and pointed NISD in the direction to facilitate the additional or modified services that Student actually received.

Regarding the requests for counseling, Parent argues that NISD did not provide counseling services upon Student's enrollment in spring 2015 despite

knowing that he was receiving counseling services in his old school district, Klein ISD. Parent does not point us to, and we cannot find, a place in the record that shows Parent's formal initial request for counseling services in the same mode and manner as the evaluation requests for speech and learning disability. Additionally, Student's November 3, 2016 request to speak with a counselor does not amount to a request for a full-on counseling evaluation. Accordingly, Parent has not established a procedural violation for delayed evaluations in violation of the IDEA's reevaluation requirement.

Secondly, Parent argues that changing Student's educational program without consulting student's IEP Team procedurally violated the IDEA. Student started at Holmgreen Elementary and was then moved to a BMC at Franklin Elementary. Then in spring 2016, at Timberwilde Elementary, Student was moved into a general education classroom for part of the day. Parent argues that this change was solely decided by NISD staff, Student's IEP team did not meet to make this decision, the IEP was not updated to reflect the change, and Parent did not receive written notice in advance of the change. Then when Student attempted suicide and was hospitalized, though Parent requested that Student be placed back in the BMC, the NISD unilaterally moved Student into an applied learning environment with no written advance notice to Parent. She says that NISD later acknowledged in an October 2016 ARDC meeting for Student that the ALE classroom was not appropriate placement for him. But, in that same meeting, the ARD Committee agreed to place Student "on a blended schedule with ALE and General Education. . . ." Then Parent argues that NISD's unilaterally switching Student from Ms. Fontenot's classroom to Ms. Ysaguirre's classroom was also a procedural violation of the IDEA. She claims that no ARDC meeting was held and that she did not receive prior notice of the change.

School districts are responsible for initiating IEP meetings and ensuring that parents are given a meaningful opportunity to attend the IEP meeting and participate as full members of the IEP Team. 34 C.F.R. § 300.322. To ensure parents are afforded the opportunity to participate in their child's IEP Team meeting, school districts are required: (i) to notify the parents with enough advance notice of the IEP meeting so that one or more parents can attend, *id.* at § 300.322(a)(1); (ii) to schedule the meeting at a mutually agreeable time and place to ensure parental attendance, *id.* at § 300.322(a)(2); (iii) provide advance notice to the parents of who will attend the IEP meeting as well as the purpose(s) for the meeting, *id.* at § 300.322(a)(1), (b)(1); (iv) ensure other methods of attendance, such as conference calling, if the parent cannot physically attend the IEP meeting, *id.* at § 300.322(c); (v) provide for interpreters at the IEP meeting for parents who are deaf or hard of hearing or whose primary language is not English, *id.* at § 300.322(e); and (vi) if the school cannot "convince the parents they should attend," the school must document its attempts to contact the parents and invite them to the meeting, including phone calls and visits to the parents' home and places of employment to attempt to arrange a mutually agreeable meeting time, *id.* at § 300.322(d). Indeed, the only instances wherein a school might proceed with an IEP meeting without the parents have specifically been outlined. 20 U.S.C. § 1414(e); *see also* 34 C.F.R. § 300.501(c)(1)–(4). In turn, a placement decision for a student can only be made without the "involvement of a parent, if the public agency is unable to obtain the parent's participation in the decision." 34 C.F.R. § 300.501(c)(4).

We hold that none of these incidents amount to a procedural violation of the IDEA on the part of NISD. The IDEA does mandate that parents be involved in the decision regarding a child's educational placement. 20 U.S.C. § 1415(b)(1). However, this circuit and others have not said that a change in a

child's school within the same district or even a change between classrooms and teachers within a school amount to an "educational placement" within the meaning of the statute. *See Weil v. Bd. of Elementary & Secondary Educ.*, 931 F.2d 1069, 1072 (5th Cir. 1991) (holding that a student's transfer from one school to the other where there are substantially similar programs, providing substantially similar classes, that implemented the student's IEP that were both under the supervision of the school board did not qualify as an "educational placement" within the meaning of the statute); *see also Concerned Parents & Citizens for Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Bd. of Educ.,* 629 F.2d 751, 754 (2d Cir. 1980) (holding that a transfer from one school to another school within same school district with similar but less "innovative" programs was not a change in educational placement within the meaning of 20 U.S.C. § 1415 as the transfers did not affect the "general educational program in which a child . . . is enrolled"); *Tilton ex rel. Richards v. Jefferson Cty. Bd. of Educ.,* 705 F.2d 800, 804 (6th Cir. 1983) (holding that a transfer from one school to another school with a comparable program is not a change in educational placement); *Lunceford v. D.C. Bd. of Educ.,* 745 F.2d 1577, 1582 (D.C. Cir. 1984) (noting that one "must identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change [in schools] to qualify as a change in educational placement"); *Christopher P. ex rel. Norma P. v. Marcus,* 915 F.2d 794, 796 n.1 (2d Cir. 1990) ("The regulations implementing the Act interpret the term 'placement' to mean only the child's general program of education.").

Lastly, Parent also argues that she did not receive prior written notice ("PWN") that Student would be changing schools or classrooms. However, the record evidence demonstrates that Parent attended each of Student's ARD Committee meetings where these changes were made, except for the ARDC meeting held on December 1, 2016. No changes to Student's placement were

discussed or made at the December 1 meeting. Parent argued in her summary judgment motion, and in the opening of her appellate briefings, that when she could not attend a meeting, the school district was obligated to invite at least one of Student's service providers while he was in out-patient therapy at Clarity Child Guidance Center. It appears that Parent was suggesting that her absence from the meeting meant that someone from Clarity should have been invited to represent her interests. But, she signed the PWN sheet indicating that her attendance was tentative and that she would let the ARDC know if she would be present. She then emailed Mrs. Garcia at 7:20AM on December 1, 2016 saying that she would not be in attendance, that A.V. knew of her concerns, and that they had permission to conduct the meeting without her present. The meeting was scheduled for 8:30AM the same morning.

NISD was not obligated to provide Parent notice of these changes within the meaning of the statute. Even if the school district was obligated to give Parent PWN as to these changes, the record reflects that she knew about the changes in schools because she attended the meetings discussing those changes. Furthermore, NISD was not obligated to invite any of Student's service providers or support personnel from Clarity. To that extent, NISD argues that it went beyond what it was required to do and contacted personnel from Clarity. However, this was at the November 18, 2016 meeting to discuss the requests for reevaluation, which Parent attended. Nothing in the meeting minutes indicate that Parent asked for someone from Clarity to attend the December 1 meeting in her stead in the event of her absence. A.V. agreed to reach out to someone from Clarity during the November 18 meeting, and it just so happened that Parent was absent from the subsequent meeting. Notwithstanding that, A.V.'s willingness to reach out to someone from Clarity was done as a mere courtesy, not an obligation.

Regarding the classroom changes, Parent argues that, at the due process hearing, NISD testified that the BMC setting focuses on providing behavioral interventions for students with severe behaviors that impede their ability to access their education. Parent also argues that NISD stated that the focus in the ALE setting is on helping students who are academically underperforming to get back on grade-level. ALE students may have some behavioral concerns which are tempered by working on life skills. Parent argues that the change from Ms. Fontenot's class to Ms. Ysaguirre's class was a change from the BMC setting to the ALE setting. She argues that such a unilateral change of this nature shifted the focus of Student's educational programming which qualifies as a change in placement under the IDEA.

We are not convinced that the differences between Ms. Fontenot's classroom and Ms. Ysaguirre's classroom constitute a change in educational placement within the meaning of the statute. *See Lunceford*, 745 F.2d at 1582. Parent wants us to look at the function of the classroom and not only how the classroom is classified. At the due process hearing, Ms. Fontenot testified that the teachers' classrooms slightly differed but, that they swapped students frequently to aid their students' learning. She did not testify that her classroom was a BMC and that Ms. Ysaguirre's classroom was an ALE. Particularly, Parent says that a close look at both teachers' daily logs supports that the classroom change was a change in programming—Ms. Fontenot conducted detailed positive and negative behavior tracking while Ms. Ysaguirre did not, Ms. Ysaguirre did not have a "documented incentive system" to reward Student for exhibiting positive behavior, and Ms. Ysaguirre "only produced a daily communication log that contained a general description of what Student did during each class period."

While we agree that we must look at the functions of the classroom, the functions between these two classrooms are not substantially dissimilar that

moving Student from one to the other qualifies as a change in educational placement within the meaning of the statute. Parent does not argue that this change disrupted the implementation of Student's IEP, thereby denying him a FAPE, or that it deprived him of the educational benefits he was receiving at the time. *See* 20 U.S.C. § 1415(f)(3)(E). She argues that this classroom change impacted her ability to participate in the decision making process for her child's educational program. Every teacher will bring his or her own personal teaching style and skill sets into the classroom. Also, we could not find anything in the record that demonstrated Parent contesting this classroom change. In the email exchange, Parent did not inform Ms. Fontenot that she or Student expressly preferred her over Ms. Ysaguirre for any set of given reasons. Even after Student was placed in Ms. Ysaguirre's classroom, nothing in the record suggests that Parent complained to school officials about this change, communicated any adverse impact that Student might have been experiencing as a result of the change, or that she requested Student to be placed back into Ms. Fontenot's classroom despite the capacity issues to which the school was adapting. Furthermore, the record shows that in later email exchanges between Ms. Ysaguirre and Parent about Student, Ms. Ysaguirre refers to herself as a BMC teacher in her email signature. Taken together, these circumstances are enough to show that, because the classrooms were substantially similar and Student's IEP was still being implemented, PWN was not required and the email Ms. Fontenot sent to Parent was purely a courtesy. Accordingly, these changes do not amount to a procedural IDEA violation since we are not convinced that Student was denied a FAPE.

## B. No Substantive IDEA Violations

A federal district court's review of an impartial due process hearing under the IDEA includes its review of the record of the administrative proceedings and review of additional evidence at the request of any party.

*Michael F.*, 118 F.3d at 252 (stating that the district court "is then required to take additional evidence at the request of any party."). Though giving "due weight" to the hearing officer's findings, the district court must "reach an independent decision based on a preponderance of the evidence." *Id.* Essentially, the district court's review is "virtually *de novo*." *Id.*

While there is "no explicit substantive standard" on the face of the IDEA, the Supreme Court did in fact recognize "a substantive standard [that is] 'implicit in the Act'" in *Rowley. Endrew F. v. Douglas Cty. Sch. Dist. RE–1*, 137 S. Ct. 137 S. Ct. 988, 998 (2017) (citing *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 193 n.15 (1982) ("*Rowley*")). "[T]his standard is markedly more demanding than [. . .] 'merely more than *de minimis*'. . . ." *Id.* at 1000 (emphasis in original). The IDEA also "cannot and does not promise 'any particular [educational] outcome.'" *Id.* at 998 (quoting *Rowley*, 458 U.S. at 192) (alteration in original).

The substantive contours of the IDEA have been fully articulated by the Supreme Court in *Endrew F.* so, we need not do the same here. Importantly, *Endrew F.* has not changed or eliminated our circuit's use of the "reasonably calculated" factors as we announced them twenty-two years ago in *Michael F.* Accordingly, to determine whether a child's IEP is substantively compliant with the IDEA, we look at if (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key stakeholders; and (4) the student received positive academic and non-academic benefits. *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009) (citing *Michael F.*, 118 F.3d at 253). When applying this factor test to the educational program of a child who is "not fully integrated in the regular classroom and not able to achieve on grade level," *Endrew F.* instructs that the "educational program must be

17

appropriately ambitious in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1000.

Parent argues that the district court's error here is two-fold: (1) factual error because the district court ignored the preponderance of the evidence in the administrative record showing that Student regressed academically and erroneously concluded that Student received academic and non-academic benefits; and (2) legal error because, in her view, the district court applied the *Rowley* standard instead of the *Endrew F.* standard when conducting its analysis. We disagree.

We first address Parent's assertion of legal error. In its analysis, the district court ultimately applied the four *Michael F.* factors despite its discussion of *Rowley*. We understand that the outcome of *Rowley* should be limited to the facts of *Rowley*. *See Rowley*, 458 U.S. at 202 ("Because in this case we are presented with a handicapped child who is receiving substantial specialized instruction and related services, and who is performing above average in the regular classrooms of a public school system, we confine our analysis to that situation."). It is clear that Student is not similarly situated to the child in *Rowley*. However, we hold that *Endrew F.* did not eliminate, nullify, nor modify this circuit's practice of applying the *Michael F.* factors when evaluating the sufficiency of a child's IEP. *See E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 766 (5th Cir. 2018) (per curiam) ("Our court's four *Michael F.* factors and the Supreme Court's holding in *Endrew F.* do not conflict . . . . Both fit together."). So, we conclude that there is no legal error because the district court's apparent reliance on *Rowley* did not differ from this circuit's well-settled analytical framework.

Next, we address Parent's argument regarding factual error. In our de novo application of the *Michael F.* factors, we only analyze the first and fourth factors since they are the basis of Parent's substantive IDEA challenge. The

first factor looks at whether the child's educational program is individualized on the basis of the student's assessment and performance. *Michael F.*, 118 F.3d at 253. The record shows that NISD conducted all necessary evaluations and developed Student's IEP around those evaluations. Student's IEP goals were revised to reflect his progress toward mastery of them, since the initial development and implementation of his IEP in February 2016. The record also points to modifications in Student's IEP annual goals from February 2016 to March 2017 for reading and from February 2015 to February 2016 to March 2017 for mathematics. Based on the FBA, Student was provided behavioral supports and goals which included a points system to track his positive and negative behavior. In sum, we conclude that Student's IEP satisfies this factor. We now turn to the fourth factor.

The fourth factor looks at whether the child received positive academic and non-academic benefits. *Id.* The record shows that Student made positive academic progress in school even while he was hospitalized for parts of the school year. His IEP progress reports for June–October 2016 reflect this progress. While it appears that the district court largely relied on that progress report, our de novo review of the record also shows progress in Student's fine motor skills during the 2016–2017 school year. Ms. Fontenot's positive testimony concerning his ability to succeed on a traditional campus speaks to this non-academic progress. Although Student engaged in task-avoidant behavior such as occasional sleeping in class, the record shows that Student's academic progress was not inhibited and that he made meaningful and measurable progress despite his severe handicap. The record also shows that Student made friends and demonstrated other signs of social interactions and non-academic benefits. Accordingly, we conclude that Student's IEP satisfies the fourth factor of this conjunctive test.

We reiterate today that a student's IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Id.* at 247–48. Student's IEP sufficiently does that. The record demonstrates that Student benefited academically and non-academically from the strictures, and subsequent modifications, laid out in his IEP. From our vantage point, *Endrew F.* does not guarantee that an IEP sufficient under the IDEA would be perfect nor does it insulate a child from experiencing hardships while being subject to the IEP. We are satisfied that NISD took the necessary steps to ensure that Student was being properly serviced under his IEP, despite his absences, and, at bottom, that is all the law requires. In sum, we conclude that there is no substantive violation of the IDEA.

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of NISD's motion for summary judgment and its denial of Parent's summary judgment motion.